UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF COLUMBIA

UNITED STATES OF AMERICA,

vs.   NO. 0090 1:21CR00100-001
       Judge Christopher R. Cooper

JACOB LEWIS

## DEFENDANT JACOB LEWIS' SENTENCING MEMORANDUM

Defendant Jacob Lewis submits this Sentencing Memorandum for this Court's consideration. Though the United States Sentencing Guidelines don't apply, Jacob requests this Court to review the circumstances of his case pursuant to 18 U.S.C. § 3553 and impose a sentence of probation.

## STATEMENT OF FACTS

1.   On January 27, 2021, Jacob was arrested in the Central District of California for various charges arising out of the January 6, 2021 disturbance at the United States Capitol. (PSR at pg. 2.

2.   Jacob was released that same day and has been on pre-trial supervision in the Central District of California.

3.   On January 6, 2022, Jacob appeared before this Court and pled guilty to Count Four of an Information charging him with Parading, Demonstrating or Picketing in a Capitol Building, in violation of 40 USC § 5104(e)(2)(G) (PSR at ¶ 4).

4.   A conviction for Count Four carries a maximum sentence of six months imprisonment, pursuant to 40 USC § 5109(b); a fine of not more than $5,000, pursuant to 18 USC § 3571(b)(6); a term of probation of not more than five years, pursuant to 18 USC §

3561(c); and an obligation to pay any applicable interest on penalties on fines and restitution not timely made. The defendant also agrees to pay a special assessment of $10 pursuant to 18 USC § 3013(a)(1)(A)(ii) for this Class B misdemeanor. *Id.*

## MEMORANDUM OF LAW

This memorandum explains why probation is appropriate in Jacob's case pursuant to Section 3553.

## RATIONALE FOR PROBATION

### I.     The Court with the Discretion to Impose a Term of Probation

Under Section 3552, sentencing courts are "to consider every convicted person as an individual and every case as a unique study in the human failings that sometimes mitigate, sometimes magnify, the crime and the punishment to ensue." *Gall v. United States*, 552 U.S. 38, 53 (2007) (quoting *Koon v. United States*, 518 U.S. 81 (1996)).

Congress has identified four "purposes" of sentencing: *punishment, deterrence, incapacitation, and rehabilitation*. 18 U.S.C. § 3553(a)(2). To achieve these ends, § 3553(a) requires sentencing courts to consider not only the advisory Guidelines range, but also the facts of a specific case through the lens of seven factors, including:

> (1)     the nature and circumstances of the offense and the history and characteristics of the defendant;
> (2)     the need for the sentence imposed --
> (A)     to reflect the seriousness of the offense, to promote respect for the law, and to provide just punishment for the offense;
> (B)     to afford adequate deterrence to criminal conduct;
> (C)     to protect the public from further crimes of the defendant; and
> (D)     to provide the defendant with needed educational or vocational training, medical care, or other correctional treatment in the most effective manner;
> (3)     the kinds of sentences available;
> (4)     the kinds of sentence and the sentencing range established ... ;
> (5)     any pertinent [Sentencing Commission] policy statement ... ;

(6) the need to avoid unwarranted sentence disparities among defendants with similar records who have been found guilty of similar conduct; and
(7) the need to provide restitution to any victims of the offense. 18 U.S.C. § 3553(a)(1)-(7).

Against this backdrop of factors, Jacob submits the appropriate sentence is a term of probation.

**II.     An Examination of the § 3553 Factors in Jacob Lewis' Case**

The following sections analyze the § 3553 factors against the factual backdrop of Jacob's case. Such an analysis is critical because it underscores the inherent necessity that a sentence of probation be imposed.

**1.     Nature and Circumstances of the Offense**

In early January 2021, Jacob flew from California to Washington, D.C. to attend then President Trump's political rally on January 6, 2021. Following the rally, he followed a huge crowd of to the United States Capitol Building. (PSR at ¶ 18).

Mr. Lewis entered the Senate Wing Door to the Capitol Building at approximately 2:56 p.m. There is video of him walking by the House Wing Doors, through the Hall of Columns, through the Crypt, and then exiting out of the South Door at approximately 3:03 p.m. (PSR at ¶ 19). While there were literally thousands of people around and inside the Capital Building, Mr. Lewis knew he did not have permission to enter the building. (PSR at ¶ 20).

Jacob has spent the past year or so on pre-trial release, with plenty of time to contemplate his actions. He deeply regrets his participation in the disturbance at the Capitol on January 6, 2021. His actions on January 6, 2021 did not involve the destruction of government property or physical violence against law enforcement. He was only in the Capitol Building for about 7 minutes.

During his first interview with the FBI Jacob admitted what he did and accepted personal responsibility for his actions. (PSR at ¶ 18). He gave FBI agents a detailed account of his travel to and from Washington, D.C., retracing each step he took inside the Capitol. He also admitted to the authenticity of photographs and videos taken of him inside the Capitol. He provided his cell phone to the FBI. Furthermore, he provided the FBI with passwords and log-in information to all of his social media accounts. After prosecutors had adequate time to evaluate what Jacob really did on January 6, 2021, a plea was offered to a 6-month misdemeanor pursuant to a plea agreement. He is sorry for his actions on January 6, 2021 and will personally allocate to the Court at his sentencing hearing.

  2.  **History and Characteristics of Jacob Lewis**

  A.  **Jacob's Childhood**

Jacob Lewis grew up in a chaotic environment under impoverished circumstances. (PSR at ¶'s 39-49). Jacob's uncle, retired police officer Dave McNaughton, first met Jake when he was a toddler and writes:

> "I first met Jake when he was two years old. He was living with his unwed mother and father in a dilapidated single wide trailer. The trailer was set on a vacant lot in the desert, under a large Tamarisk tree. There was no running water or electricity. The trailer had no kitchen, so a large hole had been cut in the living room wall and a truck camper, which was elevated on four jacks, had backed up against the makeshift hole in order to have a kitchen available. This type of living arrangement would be a regular theme off and on through Jake's childhood." **See Exhibit A, Letters in Support, Letter from Dave McNaughton**

Mr. McNaughton goes on to write:

> "In addition to these terrible living conditions, Jake was exposed to adults abusing illicit street drugs from a very early age. His mother has been addicted to methamphetamine since before I met her in 1985, and that addiction continues

4

to this day. As addicts do, she associated with other addicts, exposing Jake to the violence, abuse and lawlessness that is connected to that lifestyle." *Id.*

David McNaughton's wife, Dawna, who is Jacob's mother's sister, provides details in her letter how Jacob had no clothes and lived in squalor as he grew up.

> "Over the years Jacob bounced from property to property with his mother, staying as long they were allowed to. The shelter they had at most of the properties was typically unsatisfactory at the very best. The area they lived in consisted of the Mojave Desert, which is sweltering hot in the summer and freezing cold in the winter. Their living conditions consisted of sleeping on floors or sofas in run down, unkept mobile homes and even storage sheds at times. As for food, heat, running water or power, those were luxuries they seldom enjoyed." **Exhibit A, Letter from Dawna McNaughton.**

### B.  Jacob's Multiple Accidents and Traumatic Brain Injuries

If the adverse circumstances of his childhood were not enough, Jacob's life has become even more challenging due to a number of accidents that caused him permanent physical and traumatic brain injuries. Jacob had accidents in August 27, 2002 (Motorcycle); March 18, 2004 (Bike); June 19, 2005 (Motorcycle); September 13, 2005 (Motorcycle); April 16, 2007 (All-Terrain Vehicle); and 2017 (Bike).  (PSR at ¶'s 49-63).

His most serious accident, in 2007, which involved a roll-over of an ATV, resulted a significant closed-head injury.  Subsequent neurological evaluations determined that he suffered from dramatic change in personality; inability to regulate his behavior and emotions; diminished initiative, motivations, sex drive; inability to organize his thoughts, plans and remain on task; and inability to monitor his actions and solve problems; tension-type headaches; lightheadedness and pre-syncopal symptoms which may be related to defective conditioning and medication; defects in attention and working memory; post-traumatic hyposmia (reduced ability to smell and detect odors); and right radial neuropathy (partial) with added mechanical

5

and dexterity loss. (PSR at ¶'s 57-58).   Jacob's traumatic brain injuries were so bad that a his aunt, Dawn McNaugton, was appointed by a judge as the conservator of his affairs from 2008-2011. (PSR at ¶'s 59.). Though he has made considerable progress since 2011, there is no question that he still has daily struggles with short-term memory loss and decision-making.

While not the driving force behind his decision to enter the Capitol, Jacob's TBI and associated cognitive problems may have been a factor and should be considered by the Court in sentencing.

### C. Jacob's Professional and Personal Life

Despite his brain injuries, at age 38, Jacob has become a successful businessman and cultivated numerous business and professional contacts in his local community. He managed a gym in Victorville, California from 2013 to 2021 and eventually transitioned away from the gym to a marketing company owned by his fiancée.  He now spends most of his time providing marketing services to gyms and boating events in California and Nevada. (PSR at ¶'s 77-80)  He purchased a residence in 2016 where he currently resides with his fiancée. (PSR at ¶ 44.)

People who know him can't help but recognize his strong work ethic.

> "Jake has always displayed a tremendous work ethic.  Jake was determined to overcome the humble beginning he experienced as a child and young adult.  I personally was aware that Jake would worked endless hours at various careers to be able to succeed. It was because of that work ethic that I asked Jake to help me in my law office when I was short on staff members. Jake was very successful and extremely helpful in aiding me in marketing and interactions with my clients.  I found his work ethic and business savvy remarkable." **Exhibit A, Letter from Attorney Sharon Brunner**

**D.      Jacob's Character and Acts of Goodwill and Charity**

As demonstrated in the letters in Exhibit A, Jacob has compassion for the struggles of others, many times total strangers.  His undevoted kindness to others is certainly a character trait that the Court should factor into determining a fair and just sentence.

> "Last year, my husband (VET) was diagnosed with testicular cancer.  As we navigated the diagnosis, and took on the extensive costs to heal his cancer naturally, Mr. Lewis learned of our story and without hesitation reached out to me directly to see how he could assist. His desire to help a local family in town with no personal relationship spoke wonders to our family in such a difficult time. Mr. Lewis helped organize a car wash at a large community event on my husband's behalf to help offset the enormous bills we were faced with."
> **Exhibit A, Letter from Matt and Jessica Hinton**

> "Mr. Lewis offered to help me with a local community project that was going on for high school and middle school age youth who had just graduated. Due to the pandemic in 2020 high school graduates were unable to attend graduation. Our community came together for what we called "Adopt a Senior" and what we would do is have them create a Wishlist of items they enjoyed and we would try to purchase these items with personal funding and provide a gift to them for completing high school. Mr. Lewis contacted me and wanted to support the cause…Mr. Lewis donated one year fitness memberships to these student as well as their families." **Exhibit A, Letter from Donald Brenner**

> "Seven months ago, when my husband was diagnosed with cancer Jacob Lewis stepped up to meet my family's immediate needs.  While my husband and I were out of state in the fight for his life, we never had to worry knowing Jacob was overseeing our home and our family's needs."
> **Exhibit A, Letter from Jeannette Bradbury**

> "He has always been willing to support me, my church and our community in a variety of events designed to be a blessing to uplift people. I have witnessed his partner with local businesses to help our youth, adults and families." **Exhibit A, Letter from Youth Minister Robert Smith**

> "I met Jacob when he attended a fundraiser event for one of our Lucerne Valley Unified School District programs back in 2018.  Since that time, Jacob has offered to help our district's kids in many ways.  His sincerity and belief that all kids can "achieve anything through hard work, perseverance, and a belief in themselves has always resonated with me.  Jacob frequently attends and contributes to our

7

fundraising events, donates educational materials, and is always will provide resources and mentorship ideas to our students."
**Exhibit A, Letter from Nate Lambdin**

"[h]e is a man that supports our first responders. Jacob has been involved in community events that support man of our fallen heroes in the high desert community. Furthermore, he is a contributor to charities that help our firefighters and police officers.  Jacob Lewis is the type of friend and family member that can be called upon in time of need. He would be willing to help for any reason and would expect nothing in return."
**Exhibit A, Letter from Ronda Leon**

"Another character trait that I admire in Jake is his love and compassion for animals…Jake, too, has given his time and personal money to assist at risk animals in our community.  I specifically recall Jake working on several project that involved the saving of neglected and/or abandoned pit bulls in the High Desert area. Jake has always been dedicated to his own pets. My experience with Jake is that he is often an advocate for the vulnerable, weak and defenseless both for animals and humans."
**Exhibit A, Letter from Attorney Sharon Brunner**

### Jacob Lewis has a Lesser Degree of Culpability than Others

Although Jacob is fully culpable for his crimes, his actions on January 6, 2021 and afterwards mitigate his blameworthiness for his actions. The degree of a defendant's blameworthiness "is generally assessed according to two kinds of elements: the nature and seriousness of the harm caused or threatened by the crime; and the offender's degree of culpability in committing the crime, in particular, his degree of intent (mens rea), motives, role in the offense, and mental illness or diminished capacity." Richard S. Frase, <u>Excessive Prison Sentences, Punishment Goals, and the Eighth Amendment: "Proportionality" Relative to What?,</u> 89 Minn.L. Rev. 571, 590 (Feb. 2005). Applying these factors to Jacob's circumstances establishes that he lacks the same level of culpability as those individuals who entered the Capitol to destroy property, harm others and hijack the political process. His decision to

cooperate with law enforcement arguably saved the FBI valuable investigative and prosecutive resources that are best utilized against the violent individuals there that day.

### 3. The Need for the Sentence Imposed

#### A. To reflect the seriousness of the offense, to promote respect for the law, and to provide just punishment for the offense

In imposing "just punishment" for an offense, a sentencing court should not disregard the additional penalties and hardships that will accompany Jacob's conviction.  See Hugh LaFollette, <u>Collateral Consequences of Punishment: Civil Penalties Accompanying a Formal Punishment</u>, 22 J. of Applied Phil., 241, 244-46 (2005)(discussing and critiquing on proportionality grounds retributivist justification of collateral consequences); Jeremy Travis, <u>Invisible Punishment: An Instrument of Social Exclusion, in Invisible Punishment: The Collateral Consequences of Mass Imprisonment</u> (Marc Mauer & Meda Chesney-Lind eds., 2002).  Although Jacob recognizes the seriousness of his offense, he respectfully submits that he has already received and will be subject to substantial ridicule, threats, retaliation, and criticism for his actions on January 6, 2021.  Because of the Internet, these consequences will follow him for the rest of his life.

#### B. To afford adequate deterrence to criminal conduct

A punishment of imprisonment is not necessary to further the § 3553 factor of general deterrence since there is no correlation between punishment and reductions in crime. See Gary Kleck and J.C. Barnes, <u>Deterrence and Macro-Level Perceptions of Punishment Risks:  Is There a "Collective Wisdom"?,</u> 59 Crime & Delinquency 1006, 1031-33 (2013).  Kleck and Barnes' study concludes:

> "[t]here is generally no significant association between perceptions of punishment levels and the actual levels of punishment that the criminal justice system achieves. This in turn implies that increases in punishment levels do not routinely reduce crime through general deterrence mechanisms, because the fundamental link between actual punishment levels and perceptions of punishment levels appears to be weak to nonexistent."
> *Id.* at 1031.

The United States Department of Justice agrees with the conclusion that incarcerating defendants is not an effective means of deterrence. *See* U.S. Dept. of Justice, Nat'l Inst. of Justice, Five Things About Deterrence (July 2014). In fact, the Department of Justice finds that even increasing the severity of punishment does little to deter punishment. *See Id.* In the absence of a deterrent effect, Jacob submits that a sentence of imprisonment or jail is not necessary in his case.

        **C.**        **to protect the public from further crimes of the defendant;**

As in the case of general deterrence, the empirical evidence does not establish a relationship between sentence length and specific deterrence, regardless of the type of crime. David Weisburd et al., Specific Deterrence in a Sample of Offenders Convicted of White-Collar Crimes, 33 Criminology 587 (1995) (finding no difference in deterrence for white collar offenders between probation and imprisonment); Donald P. Green & Daniel Winik, Using Random Judge Assignments to Estimate the Effects of Incarceration and Probation on Recidivism among Drug Offenders, 48 Criminology 357 (2010) (study of over a thousand offenders whose sentences varied substantially in prison time and probation found that such variations "have no detectable effect on rates of re-arrest," and that "[t]hose assigned by chance to receive prison time and their counterparts who received no prison time were re-arrested at similar rates over a four-year time frame").

Nevertheless, the need to protect the public from future crimes by Jacob is not an issue since he poses a low risk of recidivism. As noted in the PSR, Jacob has a single conviction from an incident in 2009. As a result, he poses a lower risk of recidivism. In imposing the least sentence sufficient to account for the need to protect the public from further crimes, this Court should consider the statistically low risk of recidivism presented. *See United States v. Urbina, slip op*., 2009 WL 565485, *3 (E.D. Wis. Mar. 5, 2009) (considering low risk of recidivism indicated by defendant's lack of criminal record, positive work history, and strong family ties); *United States v. Cabrera*, 567 F. Supp. 2d 271, 279 (D. Mass. 2008) (granting variance because defendants "with zero criminal history points are less likely to recidivate than all other offenders"). Finally, in considering a variance in this case, this Court should consider the length of time that Jacob abstained from criminal conduct prior to his commission of the instant offense. *United States v. Ward*, 814 F. Supp. 23, 24 (E.D. Va. 1993) (granting departure based on defendant's age as first-time offender since guidelines do not "account for the length of time a particular defendant refrains from criminal conduct" before committing his first offense).

> **D.    to provide the defendant with needed educational or vocational training, medical care, or other correctional treatment in the most effective manner;**

A significant § 3553(a) sentencing consideration is the need to provide defendants with correctional treatment in the most effective manner. See § 3553(a)(2)(D). Jacob is a successful, self-employed, businessman. While not married, he is in a stable relationship and is not addicted to drugs or alcohol. Thus, he would not benefit from treatment in a custodial setting.

### 4. The Kinds of Sentences Available

A conviction for Count Four carries a maximum sentence of six months imprisonment, pursuant to 40 USC § 5109(b); a fine of not more than $5,000, pursuant to 18 USC § 3571(b)(6); a term of probation of not more than five years, pursuant to 18 USC § 3561(c); and an obligation to pay any applicable interest on penalties on fines and restitution not timely made. The defendant also agrees to pay a special assessment of $10 pursuant to 18 USC § 3013(a)(1)(A)(ii) for this Class B misdemeanor.

### 5-6. The Kinds of Sentences and the Guideline Sentencing Range Established and any Pertinent Sentencing Commission Policy Statements

Not applicable since the Guidelines do not apply to Jacob's case.

### 7. The Need to Avoid Unwarranted Sentence Disparities Among Defendants with Similar Records Who Have Been Found Guilty of Similar Conduct

According to Politico, as of January 1, 2022, sixty-four of seventy-one (71) people have pleaded guilty in connection with the January 6, 2021 entry into The Capitol, and seventy-one (71) of those charged have been sentenced. Sixty-four (64) pleaded to misdemeanors. Thirty (30) of the seventy-one (71) people, who have been sentenced, have received a prison sentence. Of those who have received prison sentences, the median sentence was forty-five (45) days. (https://www.politico.com/news/2022/01/04/jan-6-insurrection-sentencing-tracker-526091).

In a March 1, 2022 filing by the DOJ in another Capitol 6th prosecution, a number of individuals charged with violating Section 5104(e)(2)G) have been sentenced to a term of probation and community service. **See Exhibit B, Capital 6, 2021 Sentencing Table**.  One such

person, Julia Sizer, is arguably most like Jacob in that she was only in the Capitol for a few minutes, did not destroy property, assault police, and immediately cooperated with police. [1]

While the United States recommended 2 month's home detention, 36 months' probation, 60 hours community services and restitution, this Honorable Court imposes sentence of 12 months' probation, a $2,000 fine, and $500 restitution. *See U.S. v. Sizer*, No. 1:21-CR-00621-CRC.  With terms of probation imposed in the Sizer case, and others, Jacob would ask that he be treated in a similar manner.

Another person on the chart worth noting is William Blauser.  According to his Statement of Offense, he pushed past Capitol Police to enter the building, was involved in a skirmish with officers and remained in the building from 2:43 p.m. to 3:21 p.m. *See U.S. v. Blauser*, No. 1:21-CR-003876, Dkt. 77, pgs. 3-4.  Mr. Blauser was not placed on probation and received a $500 fine and ordered to pay $500 restitution. *Id.* at Dkt. 108.

**8.     The Need to Provide Restitution to Any Victims of the Offense.**

Restitution of $500 is applicable in this case and Jacob will pay this amount immediately after he is sentenced.  (See PSR at ¶ 106).

**CONCLUSION**

Parading, Demonstrating, or Picketing in a Capitol Building (40 U.S.C. § 5104 (2)(G)) is a misdemeanor with a six (6) month maximum term of imprisonment. That is the seriousness of the offense, as determined by Congress. This Honorable Court must consider that those individuals who did more than simply demonstrate or, frankly, just walk around the Capitol for a short time, but were offered a plea to Parading, Demonstrating, or Picketing in a Capitol

---

[1] While Mr. Lewis has minimal criminal history, Ms. Sizer had none at sentencing.

Building (40 U.S.C. § 5104 (2)(G)), and might have an extensive criminal record, may deserve a prison sentence, possibly six (6) months. But those with minimal or no criminal records, who walked through open doorways, caused no property damage, did not threaten or harass Capitol Police, and got out of the building quickly, don't deserve jail time. This conclusion is amplified when Jacob Lewis' background, character, charitable nature are factored in. The undersigned respectfully submits that the § 3553 factors lean heavily in favor of Jacob Lewis receiving a sentence of probation for a term of 12 months, a reasonable fine, and restitution of $500.

By:  /s/ Dan Eckhart                /s/ David Bigney
     DAN ECKHART, Esq.              DAVID BIGNEY, Esq.
     FL Bar No. 488674              FL Bar No: 132454
     200 E. Robinson St., Ste. 1150 215 East Livingston Street
     Orlando, FL. 32801             Orlando, Florida, 32801
     dan@daneckhartlaw.com          dbigney@bigneylaw.com
     (407) 276-0500                 (407) 425-6068

## CERTIFICATE OF SERVICE

I hereby certify that on April, 6 2022, I electronically filed the foregoing with the Clerk of the Court using the CM/ECF system which sent notification of such filing to all parties listed on the Electronic Case Filing (ECF) System.

By:  /s/ Dan Eckhart        /s/ David Bigney
     DAN ECKHART            DAVID BIGNEY